PEYTONA LUMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32330.   Promulgated November 18, 1930.

*F. M. Livezey, Esq.,* for the petitioner.
*J. L. Backstrom, Esq.,* for the respondent.

356

OPINION.

Love: The petitioner contends that it was affiliated with the Elk Creek Co. for the entire year 1920, or, alternatively, that it is entitled to special assessment under the provisions of section 328 of the Revenue Act of 1918.

The provision of section 240 of the Revenue Act of 1918, upon which rests the petitioner's claim for affiliation, is as follows:

(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated *. * * (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The respondent has determined that the two corporations mentioned were affiliated for the period November 13 to December 31, 1920, inclusive. The petitioner urges us to determine that such affiliation existed for the entire year 1920.

On December 31, 1919, total outstanding common stock of the petitioner in the amount of 2,000 shares was held by nineteen persons. Three of these persons, namely, E. K. Mahan, F. C. Prichard, and R. H. Williams, holding 1,417 shares (70.85 per cent) of the petitioner's stock, also held (in their own names and through Livezey and Smith) 1,500 shares (50 per cent) of the common stock of the Elk Creek Co. The evidence indicates that this 50 per cent interest in the Elk Creek Co. was held by the persons mentioned for the benefit of all the stockholders of the petitioner. The petitioner's witnesses have so testified and the respondent did not challenge or controvert them. Upon this basis the owners of 100 per cent of the petitioner's common stock owned or controlled 50 per cent of the common stock of the Elk Creek Co. There were no substantial changes in the stock ownerships recited during the period January 1 to November 12, 1920.

The remaining 50 per cent of common stock of the Elk Creek Co. was held by D. E. and A. M. Hewitt, who held no stock of the petitioner.

The petitioner concedes that the " control " prescribed by statute refers to control of the voting stock. *Canyon Lumber Co.*, 1 B. T. A. 473. It contends that the same interests which owned or controlled all, or substantially all, of its stock, and which owned 50 per cent of the stock of the Elk Creek Co., also controlled the 50 per cent interest of the Hewitts in the Elk Creek Co., and, therefore, that such " interests " owned or controlled all, or substantially all, of the stock of the two companies.

To establish such control the petitioner relies upon several factors. First, is the promise given Mahan by the Hewitts, that Mahan and his associates could buy the Hewitts' stock upon payment of its cost plus interest for the time that they carried their investment in the business. Other alleged evidences of control of the Hewitt's stock are the agreement by which the Mahan group managed the business of the Elk Creek Co., the fact that three of the five directors were members of the Mahan group, the loans and endorsements extended by the petitioner, and the fact that petitioner handled the sales, cost accounting, and collections of the Elk Creek Co.

We are not persuaded, however, that any or all of the factors above mentioned warrant our finding that the 50 per cent stock interest of the Hewitts was controlled by the same interests which owned or controlled the other 50 per cent of the stock of the Elk Creek Co.

The Board has had occasion in similar proceedings to consider the effect of each of the factors relied upon by the petitioner as evidence of asserted control of the minority stockholdings. The principal reliance of the petitioner is upon the Hewitts' agreement to sell their stock as detailed in our findings. Referring to this agreement, which was not in writing, petitioner's counsel stated:

    \* \* \* There was an understanding between Mr. Mahan and Mr. Hewitt,— I say while not legally enforcible, yet there was an understanding \* \* \* and at any time during the year that those interested in the Peytona Lumber Company wanted to acquire that outstanding stock that they might do so.

On brief, counsel refers to this agreement as an " option."

In *Acme Box & Lumber Co.*, 3 B. T. A. 718, the Board considered the effect of an option to buy stock, saying:

    \* \* \* A contract to buy which is binding on the seller does not itself give the buyer a control of the stock. \* \* \* Until the contract had been executed and the stock bought, the control remained in the owner.

We held to the same effect in *Madera Yosemite Big Tree Auto Co.*, 2 B. T. A. 346, and in *Island Petroleum Co.*, 17 B. T. A. 1.

The courts and the Board have frequently held that management or control of the business is not the control required by statute. In *Commissioner of Internal Revenue* v. *Hirsch & Co.*, 30 Fed. (2d) 645, the court said:

The management of the business of the corporation is not the control required by the statute. It refers to stock control. The fact that the minority is acquiescent and permits the majority to manage the business does not prove actual control over the minority interests. \* \* \* The control of the stock owned by the same interests refers to beneficial interest.

We said in *Avonmore Coal & Coke Co.*, 16 B. T. A. 909, that " control of the stock means more than control of the management." See also *Ice Service Co.* v. *Commissioner*, 30 Fed. (2d) 230; *Island Petroleum Co., supra; Watsontown Brick Co.*, 3 B. T. A. 85; *Tunnel Railroad of St. Louis et al.*, 4 B. T. A. 596; *St. Louis Bridge Co. et al.*, 17 B. T. A. 185; *Empire Safe Deposit Co.*, 19 B. T. A. 1137, and long list of cases there cited.

In *Heller Brothers Co. et al.*, 9 B. T. A. 1328, we said:

The record does show that Heller Brothers Co. controlled the board of directors and consequently they were in a position to control the activities of the Tool Company, so long as there was no interference with the rights of the minority stockholder. But this is far from a control of his stock and stock control is the test laid down by the statute.

The fact that one corporation managed the affairs of another and loaned it money from time to time does not alone warrant affiliation. *Stauffer Chemical Co.*, 2 B. T. A. 841.

And in *Howes Brothers Hide Co. et al.*, 17 B. T. A. 129, we said:

It must be admitted that the Howes Brothers dominated the company, directed its policies, and managed its business, but the test of the statute makes no mention of these factors in laying down the rule governing affiliation.

Considering the arguments advanced by the petitioner, singly and collectively, we find nothing in the record to indicate that the stock held by the Hewitts was controlled by the interests whom the petitioner contends controlled it. So far as we are advised the Hewitts were free to vote their stock as they saw fit, and presumably they did so. The fact that they worked harmoniously with Mahan and his associates does not establish that the latter had control of their stock. *Sutherland Manufacturing Co.*, 3 B. T. A. 1224. We approve the respondent's determination denying affiliation to the petitioner and the Elk Creek Co. for the period January 1 to November 12, 1920.

Alternatively, the petitioner seeks special assessment under the provisions of section 328 of the Revenue Act of 1918. Under the provisions of section 327 of the same act, a taxpayer is not entitled to have its profits tax computed under section 328 until it has established by competent evidence that there exist abnormal conditions affecting its capital or income for the taxable year involved. *Stokes Milling Co.*, 12 B. T. A. 912; *Hilles & Jones Co.*, 12 B. T. A. 1189. So far as is material herein the said section 327 provides:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

\*     \*     \*     \*     \*     \*     \*

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, \* \* \*

The petitioner's brief states that:

\* \* \* It is entitled to the benefit of special assessment because of abnormality of income during the calendar year 1920 and that such abnormality is apparent from a comparison of its income for that year with previous and succeeding years and because of the conditions prevailing in the lumber market during that year such as brought about the purchase of a larger percentage of higher grades of lumber than in other years. Without the benefit of special assessment petitioner's excess profits tax for the period from January 1, 1920, to November 12, 1920, will be 26.9% of its net income for such period.

Consideration of the above-quoted statement of its claim reveals that the petitioner is relying upon two points; namely, its asserted " over-realization " of income due to the sale of an unusually large proportion of high-priced lumber with the consequent accumulation of the poorer grades, which, nevertheless, were included in its closing inventory at the average cost of all grades, and, second, that a comparison of its income for prior and succeeding years indicates that its profits in the taxable years were abnormally high. The second point is a resultant of the first.

The petitioner's records, according to the testimony of its president, would reveal in detail the amount of each species and grade of lumber on hand at the beginning and end of the taxable year, together with the amount of each shipped during that year. They would also reveal the extent by which shipments of high priced lumber during the taxable year exceeded the usual proportion of such shipments in relation to shipments of the poorer grades of lumber. But no such detail has been offered us. We are asked to accept conclusions of the witness upon the factual issue and this we will not do. If an abnormality resulted from the conditions alleged by the petitioner, clearly it is susceptible of definite proof. We have no such proof and we find no merit in this claim.

Nor can we afford the petitioner relief because its net income during the taxable year exceeded that of prior and succeeding taxable years. The petitioner offers no proof that its prosperity during the taxable year resulted from an abnormality. There is nothing to indicate that the petitioner's capital was other than normal for the business in which it engaged. The mere fact that a corporation earns large profits in an especially favorable year does not create an abnormality in its income such as to entitle it to special assessment. *Ferdinand Buedingen Co.*, 13 B. T. A. 1065; *Western Valve Bag Co.*, 13 B. T. A. 749; *Albert's, Inc.*, 10 B. T. A. 1132; and *California Iron Yards Co.*, 15 B. T. A. 25. And the fact that the taxpayer considers its tax too high is not sufficient to warrant special assessment. *Cleveland & Western Coal Co.*, 4 B. T. A. 93.

As a further ground for special assessment the petition alleges use of a large amount of borrowed capital in the petitioner's business. This point requires very little discussion. The use of borrowed capital in large or small amounts can justify special assessment only when its use creates an abnormality. We have no evidence of such a result. As we said in *Peck Coal Corporation*, 15 B. T. A. 189:

It may well be that the use of as much money as was borrowed by the petitioner * * * was the usual, normal and ordinary course of business dealings by corporations engaged in the same or similar enterprises.

See also *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566, and *Mutual Oil Co. of Arizona*, 14 B. T. A. 538.

We hold that the petitioner has failed to establish an abnormality affecting its capital or income for the period January 1 to November 12, 1920, or for the year 1920, and, consequently, we approve the respondent's denial of special assessment for each of such periods.

*Judgment will be entered for the respondent.*